We have three cases on today's docket schedule for oral argument. The first is cause number 22-40516, and that's United States of America v. Etheridge. Is the appellant ready to proceed? Thank you, Judge Graves, and may it please the Court. Your Honors, my goal this morning is to persuade the members of this panel that there are problems worth fixing with two separate components of Reed Etheridge's sentence, specifically with the life prison term he's been ordered to serve and the $22,000 in restitution he's been ordered to pay. Now I'm going to start with the prison sentence and our argument that there's good reason to think that the Court's decision to impose life, as opposed to a three or four-decade term of years, was influenced by a mistaken understanding of the evidence that the Court identified as most relevant to that grave decision, the future risk assessment report provided by our defense expert, Dr. Thorne. After that, I'll turn to our claim that the restitution orders lack any evidentiary support and should be vacated. But so then I guess I'll move directly to our request to have the prison sentence remanded for reconsideration based on what we view as a material misunderstanding of the evidence that mattered most to the District Court. And I want to be up front with this. The facts of this case are ugly, and that is an understatement. That's why the guideline range placed recommended life imprisonment. And it's also why the District Judge, Chief Judge Crane, pushed retained counsel below to get an expert evaluation, to get Dr. Thorne to assess risk. But there's also some important things that the Court noted throughout the hearing that is important for this Court to recognize. It's one, he came into the sentencing hearing open to a non-life sentence. He was leaning toward life, but he was open to persuasion. He stated that expressly on the record. The other thing that's— Isn't that just what every judge is supposed to do before a sentencing hearing, come into it open? Absolutely, Judge Graves. And all I'm saying— So we shouldn't attach any special significance to that statement, should we? The only significance you should attach is that this is not a case where the judge made clear during the hearing that it would have imposed life regardless of anything else, right? It would have imposed life without reference to the things that happened at the hearing. And so it's more like to reinforce the point that there is prejudice here, that this mattered. This mattered. And the reason it mattered is the District Judge— I think he was even more deliberate in his thought process to have made a statement like that prior to— The judge was certainly deliberate in his thought process. This is not any—we are not here to say that Chief Judge Crane did not take this very seriously and that he did not give very serious consideration to this grave choice that was before him. But the point that we're making in our claim of error is based on a well-established rule that's been around since at least United States v. Tobias in 1981, in that it is plain error and the appropriate remedy is remand if the judge operates under a mistaken understanding of important sentencing evidence. And as we've explained in the briefs, we think that the judge misunderstood Dr. Thorne's report or his conclusions as to risk in that report in two ways. First, as to the degree of risk, we think that the judge's statements made clear that he believed that Mr. Etheridge presented a higher risk than the single-digit risk that the doctor actually reported. And more importantly, we think that the judge misunderstood the duration of that risk. The report was very clear in stating that Mr. Etheridge is in this average category or moderate category of risk based on the assumption he'll be released when he's 60. But there was just no realistic possibility that a sentence that would allow Mr. Etheridge to be released before age 60 was on the table. That would have been a 20-year sentence. With good time, he would have been out in about the time that he would be need to be in order to turn 60 years old. The judge was not considering 60 years. In fact, counsel below asked for 30 years. The guideline range on the lowest counts only because they were capped at 30 years was 30 years. We are talking about a choice between 35 or 30 years, maybe even 40 in life. And if Mr. Etheridge is released at age 40 or after 40 years or after 35 years, he will be in his mid-70s, he would be well beyond the threshold to be in the lower category of risk. And what that means is that at the time of sentencing, his present risk category was actually an entire category lower than the district court believed he was in. And we know from the district court statements that Chief Judge Crane was very concerned about the level of risk Mr. Etheridge posed. He said three different times on the record, I read the report to say that there is an average chance of reoffending. Now I've offered the colloquial, you know, references in the briefs about you wouldn't expect 7% chance of rain if somebody said there's an average chance that it's going to rain tomorrow. If one of the members of this court said there's an average chance that Saints would win the case, I wouldn't think that the court was suggesting that it was a 7% chance. And so that, coupled with the district court very expressly comparing the risk that was reported for Mr. Etheridge to the risk that was reported for the co-defendant, Alicia Cronkite, the court made very clear at the beginning of the sentence. I think the doctor's assessment was significant and disturbing in comparison to Mrs. Cronkite. The problem is, Ms. Cronkite was in the category below Mr. Etheridge. Mr. Etheridge is in the average category on this static 99 tool. Ms. Cronkite could only have been in the category below that. But the district court made very clear he thought that was a material difference between the two defendants. Ms. Cronkite, of course, received 15 years, and I'm not in any way trying to equate their culpability in this crime. What I'm simply suggesting, excuse me, Your Honors, is that the district judge believed that it was the difference between the risk reported for her and the risk reported for Mr. Etheridge that was the crucial reason why incapacitation, the incapacitation of a life sentence was necessary in this case. And so it's, this is a situation where the court doesn't have to write an opinion guessing as to what the district court meant by average. What we're suggesting by the court's statements is that it reflected that the court believed that there was a higher likelihood than single digits, but then no matter what, the court certainly believed that the risk that it thought was untenable would exist no matter when Mr. Etheridge was released, and that's just not the case. And so what we're saying here is that that was... The decision wasn't based solely on the report, right? Did he say on the record that he was considering more than just the report? Yes, Judge Douglas. He did exactly what a district judge is supposed to do. He considered all the 3553A factors, and he went through them, but it's important to note, and as the Seventh Circuit recognized in the United States v. Bradley case I've cited in the brief, when a judge, and as this court recognized in United States v. Broussard, when a judge has a misunderstanding or is allowing an improper factor to influence one factor, that necessarily skews the balance. It implicates the rest of the sentencing decision, and that's why, Judge Graves, it's relevant that the judge was open because the judge didn't say, look, regardless of the level of risk you pose in the future, I think that there's this other factor that would cause me to impose life regardless. The judge made absolutely clear it is the risk that you present in comparison to your co-defendant that causes me to think life is important. And again, the reason why that was mistaken, or not necessarily mistaken, but the district judge didn't fully understand the report, is that that risk would not exist if it imposed the type of sentence that it was likely to impose if it would ever impose a term of years, 30, 35, 40 years. And there's reason, Your Honors, to believe that if I was able to stand in front of Judge I would be able to tell Judge Crane these nuances in the report. I would be able to tell Judge Crane that, in fact, it was a single digit. I would be able to tell Judge Crane that, in fact, he is in the exact same category as Ms. Cronkite. And I would be able to tell Judge Crane that the Static 99 people who report these things, or the creators of this risk assessment tool, make very clear that it is likely that individuals in this category will even decrease further with treatment. And of course, if Mr. Etheridge gets a 35-year sentence, he will have three decades of treatment, and he'll be being released in his mid-70s, and he'll have burdensome conditions of supervised release. So you're saying, though, it was clear at the time of the sentencing that the judge misunderstood this report? It missed— Based on the judge's statements, that was clear? That is a much more eloquent way— Was there an effort made by defense counsel to clarify for the judge? Judge Graves, we've made an argument in our brief that the error was preserved. I stand by what I said in the reply brief, which is that that is not a frivolous argument. It's non-frivolous, but it is not the strongest argument. The counsel mentioned an assumption, but she did not state what that assumption was. And, you know, there was a reason I briefed this as if it was on plain error, and that's because I understand how this Court looks at preservation, how most courts look at preservation. And we think that the error here, the misimpression here was serious enough to warrant correction under plain error review because of the stakes at issue and because the judge was open to consideration. If there's no further questions for now on that issue, then I would like to turn to the restitution in order to at least get this out, you know, to address this. So the other error that we think merits correction here is that the district court awarded $12,000 to one of the victims and $10,000 to the other victim, but it did so in the absence of any record evidence of restitutionary losses. This Court has been very clear as many times as it can be that every dollar in a restitution award must be accounted for even when we're estimating. And that, of course, makes sense because restitution is intended to give back the victim what they've lost. It's not intended to punish and it's not even intended to compensate for damages, the type of damages you would see in a civil proceeding. And here, the evidence in the record is there is no evidence. The PSR didn't contain an accounting ever and it's required to by statute 60 days prior to sentencing. Only one parent returned an affidavit and on that affidavit she claimed no amount of loss. The trial prosecutor's only contribution on the subject throughout the proceedings was to twice confirm that there were none of the para-line type of losses, meaning the prospect that one of these images had gotten on the internet and people would see it in the future and the person would be harmed by that knowledge. None of that. No evidence in the record of that. The only thing that the district judge relied on was the unsworn allocution statement of one of the parents, Mr. Cronkite, when he reluctantly guessed that he had spent maybe $2,000 up to that point after stating that he honestly did not know, after saying he preferred not to guess, and after stating he hadn't thought at all with his prior therapist or his daughter's prior therapist about future expenses. And so the district court relied on that to not only award money to KC but also to EE, the second victim, his own daughter. That is clearly wrong, right? A restitution award has to be based on the offensive conviction. It has to be based on the particular victim's losses. Even if these two young girls experienced similar trauma, and no one doubts that they did, people deal with trauma in different ways. One of these women in the future would maybe only have to see a therapist twice a week and have different bills, but then the other one might need more intensive therapy and see it five times. So you can't base an estimation for one victim based on what happened to the other victim. But the other thing that the government overlooks is that the $2,000 guess isn't actually evidence. It's just a claim. And what we do in the restitution context is we require evidence to support a claim. He said $2,000, what kind of evidence could we expect to see? If he had said, I remember taking my daughter in July through September, and here's one invoice for $300, that would be evidence. That would be a template for estimation. And then the defense would be able to attack that evidence or investigate and say, hey, this receipt actually has two different numbers on it, one of them for your own counseling session, so that wouldn't count. Or it appears you forgot that during one month in July you went on vacation, so there wasn't a type of thing. We can't rebut a bare claim of $2,000 for the first time at sentencing. And so we are asking this court to vacate those restitution orders because there's no excuse for the government to not have done its statutory duty to gather and produce that evidence. Should we vacate it or remand? On the restitution order, Judge Wiener, our position is that you should vacate and render judgment of no restitution, or if you do, we are obviously hoping you will remand for reconsideration of the sentence. If that occurs, we would say to confine any restitution proceedings to the record. If we affirm on the sentence, wouldn't it be sort of a hollow act to remand for a judgment on the restitution? I think so. There would be, the only thing you would need to do is ensure that there's a limited remand to amend the judgment. But this court could certainly, in its opinion, modify the judgment by rendering a judgment of no restitution, and that would be sufficient in the future to defend against any attempts to get that award.  Thank you, counsel. Thank you. May it please the court, Loretta Berry for the United States. There are two big problems with the defendant's argument that the district court misread the static 99-R report, one of the assessments that the psychologists used. The first big problem is that defense counsel agreed with the court's understanding of the report. At record 290, during the sentencing hearing, the district court was discussing recidivism with defense counsel, recidivism about the report. The court stated, and I quote, I think there is an average chance that that will happen is how I read the report. The door is open for you, though, to disagree or to suggest that it says something otherwise or to point it out to me. Defense counsel, he does say that. Under this court's precedent in Zarco-Baeza and Cotto-Mendoza, this court is bound to review this issue for a plain error review. These two distinct challenges to procedural and substantive reasonableness that are raised for the first time on appeal, especially when the district court asked point blank if he had read the report properly and defense counsel had agreed. The second big problem, though, under plain error review is that the defense read of this test is not clear and obvious. If the court will look at the report under the subheadings assessment of risk and summary of opinions, Dr. Thorne states that Etheridge poses an average rate of recidivism. That's record 478, record 481. Now the single digit likelihood statistics that are discussed in that report, those are for documented recidivist convictions and documented arrests. That's a huge distinction because as this court knows, many, many child sex offenders go unreported. Even this defendant began his sexual deviancy at the age of nine. There are many, many things in this report that refute the defendant's assertion that he has a single digit likelihood of recidivism. Under the research-based risk factors section of the report, record 480, Dr. Thorne details the deviant sexual acts and molestation on multiple occasions of his three-year-old sister when he was nine. The report details bestiality with a female dog twice, that he watched incest, bestiality, and violence-related porn. He had a history of psychiatric impairment and excessive masturbation. He engaged and targeted an extra-familial victim, six-year-old K.C., and he raped his own four-year-old daughter, E.E. Now the statistics that are talked about with respect to the single digit likelihood, those do not distinguish between the run-of-the-mill child porn voyeur and someone like Etheridge, who engages in incestuous pedophilia and production. The district court pointed out that distinction at record 287. Now defense counsel talked about Brady and Broussard. Every single case in the original brief and in the reply brief involved conspicuous mistakes by the district court at sentencing, such as the court erred with respect to criminal history, the court sentenced the defendant on top of the error, or the court misspoke about the facts of the offense. In this case, it's pure speculation that the court somehow misunderstood the static 99R in these two distinct ways. And that's fatal under the first two prongs of plain error review. And as this court has recognized, the district court was very careful at sentencing, record 317 to 318. He made sure there was a psychological evaluation. And I quote, Judge Crane carefully reviewed it. He reset the sentencing hearing multiple times to leave no stone unturned given the seriousness of the case. Yes, this is a life sentence, but it is a guideline sentence. And a guideline sentence is presumptively reasonable under this court's precedent. Etheridge merely disagrees with the weight that's given to protecting the public from future harm. And yes, that was a huge concern of the court's, but it wasn't the only concern. District court stated that that was one of the sentencing factors is to protect the public. Judge Crane said, and I quote, I had considered all of the 3553A factors very closely. Record 290, record 318. Indeed, he considered Etheridge's history and characteristics. Judge Crane stated, there's a lot of background information on him. Record 288. Indeed, the court was referring to the research-based risk factors relative to his deviant sexual activity beginning at 9. For the court spent a full three pages of the sentencing transcript discussing the nature of the offense. Again, that's another 3553A factor. The court was very disturbed by the fact that this was incestuous pedophilia, which is very These were multiple victims that were abused by Etheridge for a lengthy period of time. For Casey, it was at least two years. These were very, very violent acts against a four-year-old and a six-year-old. Etheridge kept a categorized 300 plus file, which he reviewed and categorized of his collection of child pornography. He groomed Casey to rape her, and he actually raped and videotaped four-year-old E.E. Under similar situations, courts have affirmed life sentences as this court has done in Sanchez. So this guideline sentence is reasonable, substantively and procedurally under plain error review. Moving to the second issue, here's why the district court got restitution right under plain error. Under Reese, this court holds that sworn testimony and affidavits that are sworn to are not required. Hearsay evidence is admissible at sentencing so long as it bears a minimum indicia of reliability and the defendant can rebut the evidence. So we have held that evidence is required in support of an award of restitution. Yes. What evidence is there in this case? Under Villa-Lobos, you can have a victim impact statement and a statement addressing the court in open court during sentencing, and we have both, Your Honor. We have that here. Casey's father stood up at sentencing, and he stated that he had spent $2,000 in past therapy expenses for six-year-old Casey. He stated in open court that he estimated he would spend about $1,000 until her teenage years. There was no rebuttal evidence. There was no request for invoices. There was no objection whatsoever. So under Reese and Villa-Lobos, the court, the district court, is entitled to credit that evidence. But the government didn't offer any evidence, did it? Wasn't this at the urging of the judge that he offered some testimony about what he had spent and then what he estimated he would spend in the future? That is true. But let me dispel the notion that the court was somehow negligent—excuse me, the prosecutor was somehow negligent in producing more detailed analysis of restitution costs. Here's why, Your Honor. If you take a look at—if the court takes a look at the revised PSR— You said the prosecutor was negligent. I'm trying to figure out what the prosecutor offered at all in support of restitution. I'm trying—I will explain why— What the prosecutor offered? I will explain what the prosecutor did against the very difficult—against the fact that the victims were unwilling to give victim impact statements and unwilling to provide affidavits. And the support for that, Your Honor, is in the PSR. In the PSR, at Record 369, the probation officer states that he mailed a declaration of victim losses affidavit on May 3rd, 2021. As of June 1st, 2021, no response from either of the victims. At sentencing on July 8th—sentencing occurred on July 8th. So when K.C.'s father stood up at sentencing and said, oh, I wasn't aware that restitution is an option, that's because he never returned the affidavit sent from the probation officer. He never returned the victim impact statement that E.E.'s mother returned. It's not in the record, but the— Why shouldn't we assume that these victims or parents waived their right to restitution? Because, number one, with respect to K.C., we have unrebutted evidence on the record that her father had already spent $2,000, already spent that money, and it was unrebutted. It was unobjected to. With respect to E.E., Your Honor, this is a 4- to 5-year-old child who hasn't made an outcry statement yet, and, in fact, she did receive past therapy. It was free, but the court can't consider that in its restitution considerations. And under the statute, 2259, we have a victim. It's indisputed there's causation here. And under those two facts, the court is required to order a restitution under the statute for the full amount of any losses incurred, which is $2,000 unrebutted, or that are reasonably projected to be incurred in the future. And that's the big distinction here between the general restitution statutes, like 3663. Those— So you can explain how the court arrived at this $12,000? Absolutely, Your Honor, I can. And as for K.C., I can explain it because K.C.'s father stated that he spent $2,000 for the past two years that was unrebutted, and he anticipated $1,000 for the next 10 years. There was no objection, no refuting of the evidence. Under Reese, the court can credit that, and that's exactly what the court did. With respect to E.E.— But you said there was no objection. All he did—he said, I estimate this is what I'm going to have to do. I'm not even sure how you object to that, other than to say, I object. You can ask for— That's just an estimate. It's speculative. Well, there was no objection when the court imposed the restitution amount. And under the case law, again, getting back to the fact that the restitution statutes for sexual exploitation of children are much broader than the general restitution statutes. The very first sentence of 2259 says, notwithstanding 3663A or 3663— Is there anything in the record to reflect that if we affirm the life sentence, there would be any way for the defendant to make restitution? Yes, Your Honor. There is. There's about $18,000 in a teacher retirement account. There is that. And let me point out, Your Honor, that this Court's case law under 2259, under a plain-error restitution issue, I quote from the case law that it cannot be a precise mathematical inquiry. And the reason for that is that there is a strong congressional intent that mental health will manifest itself later in the future for these young children that don't make outcry statements. Let me also point out that under plain-error review, defense has yet to cite this Court a single case that supports zeroing out restitution under facts like these, where there's no dispute— But there's plenty of cases—you're talking about a case that says we can zero it out. I'm just talking about all the cases that say some evidence is required in support of an award of restitution. There has to be some evidence in the record. Right. And what are the types of some evidence? I direct the Court to Villa-Lobos, which tells the Court what types are sufficient. The types that are sufficient are victim impact statements and statements in open court by the victim. They do not have to be sworn. Those are the two types. That's under Villa-Lobos. And the reason that we conceded error in Villa-Lobos is because the district court swung blindly and picked a number out of thin air because there were no victim impact statements and there were no statements in open court about any number. Here we have a— No victim impact statement. That is correct, Your Honor. Here we have victim impact statements. We have about E.E. stating that her mother states that she fears— I thought you said you had no victim impact statement. We have— And they didn't complete it and return it. As to K.C., Your Honor, the father, he did not return his victim impact statement. E.E.'s mother did. And we have a definite statement of a monetary amount in open court by K.C.'s father. The Court applied a very reasonable amount for E.E. He used the present— The Court felt that the record was wanting on the issue of evidence for restitution. Is there any case law that allows for supplemental evidence on that issue? Is Villa-Lobos one of those cases? Villa-Lobos, yes, Your Honor. It would be Villa-Lobos. And I'm unaware of any court that would—any case that would zero out restitution. The proper remedy would be to send it back so that the victims themselves who would not be punished—I would argue if that would be the route the Court would go, that we were K.C.'s father from E.E.'s mother. And therefore, under Villa-Lobos, the proper remedy would be to send it back for remand, if that would be—to answer your question, Your Honor. If the Court has no further questions, I respectfully request that the judgment be affirmed. Thank you, counsel. Rebuttal. Thank you, Judge Graves. Just a couple points to make on rebuttal. I'll try to hit both issues. Just as to the claim that we're speculating about what the judge understood at sentencing, all we can ever do is look at what the judge said. And what the judge said here was that the reason I'm giving you a life sentence is because you present an average chance of reoffending. Forget whether or not he was right or wrong about the single digit attached to that. He believed that that category was the reason for life. But that category, unequivocally, based on the doctor's report, would not apply under any realistic sentence that was imposed here. That is an important thing to understand. And the district court clearly believed that if he gave a sentence that would see Mr. Etheridge released, he would present an average chance of reoffending. That is not correct. And the report said it. And so that—if the average chance was the thing, the tipping point, the fact that that would not exist in the same way the district court thought it would is the reason we're asking this court to remand for resentencing. I understand that it's a difficult situation. I do not disagree that the counsel that Mr. Etheridge had at the time were to put it charitably out of their depth. And I can't do anything about that. But what I can do is tell this court what the district court said and what those statements reveal. It was overlooking in this very gruesome, very difficult record. And that's our submission as to whether or not you should decide to give the judge a different chance with the full view of the record. As to restitution, I was the lawyer who worked on Villalobos. That was my case. I have a little bit of a more intimate knowledge with that case. The restitution award was zeroed out in that case, as I pointed out in the reply brief. The court decided to remand it to the district judge to decide if there were special circumstances to let the government reopen and supplement the record. And Judge Head said, no, there weren't. You knew your burden. You didn't try to put any evidence in the record. And I didn't stop you from doing it. In fact, I tried to make up for the fact that you didn't do it. And so that's what happened in Villalobos. Supplemental evidence was allowed? No. The judge said, I am not going to allow you to put supplemental evidence in because there are no special circumstances here that would allow you to do that. So is your argument that there are no special circumstances here in this case? Absolutely. That's what we've said in our brief. And the reason there's no special circumstances that of the kind that this court's recognized before is that the government's burden was clear. The district judge did not stop them from putting in that evidence. And there is none of the other type of factors where there was actual evidence in the record, but it was just not put in because of government negligence, like what happened in United States versus Jimenez. And so all you've got here is what I believe, what we normally do in the American legal jurist, American legal landscape, it is a fundamental proposition that when a party doesn't present evidence on a matter, we assume that's because there is no evidence. That would apply to anybody. But we know that's not the case because there is past therapy. We know that we have been told. One estimated a cost and the other one was free to that purpose. Right. So no loss. And then the other one, we have a statement that the individual went through therapy. We don't disagree with that. What we're saying is that there's no evidence to support that number. And there's, you asked about how do we get to the $10,000 number for future expenses? Why only 10 years? I can't tell you why the judge thought that this little girl would only need therapy for only 10 years and awarded only $10,000, estimating 1,000 a year for 10 years. Why not 20? I mean, because there's no estimate, there's no basis to say no expert opinion, no even lay opinion suggesting that this person would need therapy for this amount of years based on this type of evidence. And so that's, there's just, it is not the case that there's evidence here. And I sympathize with the situation here, but the Congress has placed this burden on the government to get evidence specifically by statute. They did, these parents did have an attorney that was the United States attorney. And what do we do about the fact that the parents seem to not care about restitution? Judge Wiener, I would, I would disagree a little bit with the premise there that they didn't seem to care. What I would suggest is that they were hopeful that there wouldn't be these problems in the future. That is probably naive, but it's also understandable given their relationship to these victims. And I, and with Cronkite, it's a special situation because his wife was the co-defendant and he was still loyal to her. He made clear in the, he asked the judge to impose a sentence of two years.  And so he was conflicted in a very serious way because the restitution award that goes against Mr. Etheridge as to that child necessarily goes to Ms. Cronkite as well. So he would be effectively saying, I need to come after myself to recover those losses. And so. None of that is special circumstances under your argument. No, no. First, I mean, the parent had every opportunity to give the information. The government had every opportunity to request. It has statutory obligations to notice the district court in advance if it's impractical. So if they thought that it was being difficult, that Mr. Cronkite was being difficult, they could have told that to the district court ahead of time and we could have dealt with it. But they didn't. And so, Your Honors, we ask that you vacate the restitution award and we also ask that you remand for resentencing. Thank you very much. Thank you. The court will take this matter under advisement. We call the next case which is cause number